GUILLERMO ATILES MORÉU, ETC., EX REL., SUSANO CASTRO DEL VALLE, Plaintiff and Appellee, *v.* SAN JUAN TRADING CO., INC., Defendant and Appellant. GUILLERMO ATILES MORÉU, ETC., EX REL., SUSANO CASTRO DEL VALLE, Plaintiff and Appellant, *v.* ALCOA STEAMSHIP CO., INC., SAN JUAN TRADING CO., INC., and JAMES NOURSE, LTD., Defendants and Appellees.

Nos. 445, 446.        Decided November 4, 1964.

*Luis E. Dubón, Luis E. Dubón, Jr., R. García Cintrón, A. Torres Braschi,* and *R. Ruiz Sánchez* for appellant San Juan Trading Co., Inc. *Nachman & Feldstein* for Susano Castro del Valle. *Hartzell, Fernández & Novas,* and *Vicente M. Ydrach* for James Nourse, Ltd.

Division composed of Mr. Justice Blanco Lugo, as Chief Judge of Division, pro tempore, Mr. Justice Dávila, and Mr. Justice Ramírez Bages.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

Susano Castro del Valle worked for an independent freight carrier duly insured with the State Insurance Fund. He was struck by some bales of jute sacks while performing the duties of his occupation. He suffered serious injuries. He was compensated by the Fund.

The Manager of the State Insurance Fund, subrogating himself in the rights of the laborer, filed in the Superior Court, San Juan Part, the civil action which we now consider. He joined as defendants the San Juan Trading Co., Inc., Alcoa Steamship Co., owner of the pier and warehouse where the accident occurred, and James Nourse, Ltd., a British shipping company owner of the motor ship "Shahzada" aboard which the cargo of bales in question arrived in San Juan. He based his claim on the alleged negligence of San Juan Trading Co. and/or James Nourse, Ltd., whose agents and/or employees formed the stack from which the bales broke loose, "such stack having been improperly and negligently made and reinforced with wooden beams by defendants, their agents and/or employees," causing the dislodgment which injured appellant.

In their answers defendants denied the averments of negligence and damages. James Nourse, Ltd. and San Juan Trading Co., Inc., filed claims against coparties, the former

holding the San Juan Trading Co., Inc., and Alcoa Steamship Co. liable for the damages caused, and the latter alleging that any intervention and participation in the stack had been in its capacity of agent for James Nourse and within the limits of the agency without negligence, wherefore the liability was assignable to Nourse, the principal.

The hearing of the case having been held on the merits, by stipulation of the parties the claims against Alcoa Steamship Co. were dismissed. At the close of the evidence the trial court dismissed the complaint as to James Nourse, Ltd., dismissed the claim against coparties, and rendered judgment ordering the San Juan Trading Co. to pay $3,477.40 to the State Insurance Fund and awarding an indemnity of $25,000 to the aggrieved party plus a sum for attorney's fees. Both plaintiff and San Juan Trading Co. appealed to us. We decided to review the judgment.

Defendant assigns eight errors. We shall discuss the first three jointly. San Juan Trading alleges that it was error to determine that the stack from which the bale fell which injured plaintiff was unsafely and negligently made; that the hazardous condition which gave rise to the accident was created by its employees and that San Juan Trading had knowledge of it, and that the accident was due exclusively to the negligence of its employees.

The evidence presented by plaintiff in support of his contention consisted of his own testimony and of that of his employer, Manuel Castro Molina, two foremen of the pier, and a fellow worker. Castro del Valle testified briefly that on or about March 9, 1955, the date of the accident, he was employed as "a peon loading and unloading" the truck of Manuel Castro Molina. On the morning of the occurrence he and other employees arrived at the Alcoa pier in the employer's truck for the purpose of picking up a cargo of bales of jute sacks bound for Central Constancia of Toa Baja. The bales were piled in a stack in columns three or four

bales high, arranged in a block. There were several stacks consisting of different number of bales separated from each other by a narrow space. Although during the hearing of the case there was confusion on the shape of the bales, an examination of the photographic exhibits admitted in evidence and their dimensions leave no room for doubt on their rectangular shape and predominantly flat surface all throughout. The jute sacks were protected with a piece of canvas or cover of coarse texture and were fastened with three or four steel hoops to make the bales more solid.

Plaintiff and his coworkers walked over to a stack of bales consigned to Central Constancia. At a distance of 18 inches from the latter was the stack from which the bales which injured appellant broke loose. It was four bales high and was consigned to another consignee. They loaded Castro Molina's truck with bales from the Constancia stack and made a trip to the Central.[1] They returned to the pier around noontime for the purpose of picking up another load of bales from the same stack. Only the bales of the first layer remained. In the absence of Castro Molina another public carrier named Juan Gay had picked up another load of bales from the same stack.

They started again to load bales on the truck. Plaintiff had his back to the nearby stack fastening a rope to the truck's platform. He did not notice the stack, "we did not have to because it was not ours." He heard a scream of "look out! which did not give me time for anything," followed by a blow on the left hip which knocked him to the pavement of the warehouse, and was caught under one of the two bales which suddenly broke loose from the side of the nearby stack.

[1] The injured's testimony and the cart checks signed by Castro Molina appearing in Exhibit A of appellant establish that the latter picked up two cargoes of bales from the Constancia stack the day of the occurrence.

Plaintiff admitted that his experience in handling cargo as employee of Castro Molina consisted in transporting newspapers, hardware goods, rods, and other miscellaneous freight, and that it was not until the day of the accident that for the first time "he worked handling those bales." He asserted, however, having seen "there in the Central" bale stacks built in such a way that the bales were "interlaced," so that each layer or level of merchandise is intertwined with the preceding level.

The testimony of carter Manuel Castro Molina was more explicit respecting the way which plaintiff believes is the "correct" way of stacking sack bales. He was present at the occurrence of the accident which injured plaintiff. They had loaded some bales which "had an average of over 30 square inches." The witness was expecting a bale "which they were pushing from underneath; I saw a bale breaking loose from the nearby stack . . . I screamed, the boys fled, but Susano could not manage and was caught."

Like Castro del Valle, the witness' observations on "the best way" of building stacks are confined to his observations on the manner of stacking sack bales "there in the Central." He admitted that all the bales which were on the Alcoa pier were stacked "on top of each other," while in the Central they are "fastened" or placed in conical shape. He stated that by this stacking method the number of bales is reduced in the different levels so that each bale rests on the space between the two lower bales. He said that "we do it that way because almost always those stacks break apart . . . after they are quite high." On cross-examination by appellant, he said that he noticed an inclination in the stack from which the bale fell "it was not completely straight . . . the difference could be seen at the top." Foreman Serafín Esteban, witness for appellee, testified that on the pier where he worked he fastened stacks which were too high, because the vibration of the pier produced by the

traffic of trucks could knock down the load. However, the bales are stacked on top of each other when there are not many. On cross-examination he asserted that he had never seen a stack of bales fall apart. Lastly, Ramón Dones, appellee's coworker, asserted that subsequent to the slide he saw some wooden beams which supported the stack on the back.

The evidence presented by appellant denied the averments of negligence in the preparation of the stacks. It produced experts in stacking shipping cargo. Its employees and supervisors also testified on the safety and firmness of stacks made by placing the bales on top of each other. It said that this is the correct method of making stacks in accordance with the best practice prevailing in the industry. It was established that during 16 years appellant imported 95 percent of the bales of jute sacks introduced in Puerto Rico prior to the commencement of bulk shipments. They were always arranged on top of each other in square or rectangular stacks without the occurrence of mishaps. The bales unloaded from the motor ship Shahzada were also stacked that way, the foremen who took part in the unloading of the ship having asserted that the stacks thus made are completely safe. Candelario Parot and Rodolfo de Jesús, who witnessed the building of the bale stacks in question, testified to that effect. At the time of the accident Parot held the position of superintendent of appellant's pier, supervising the foremen in the loading and unloading of the bales consigned to appellant.

They made the stacks with the help of mechanical equipment known as fingerlifts for lifting the bales to the proper position while the stack is being made.[2] He testified that

---

[2] Appellant presented evidence to show that it rented the use of fingerlifts to unload and stack the bales which injured plaintiff. Witness Parot testified that "the Alcoa" offered this equipment to whomever requested it. Castro Molina did not use it, nor did carter Juan Gay.

he observed Castro Molina's employees loading the bales on the truck, "not with the fingerlift but by hand . . . in that case they have to use an iron bar to dislodge one bale from another." He stated that this is not the "safe method" of placing and unloading bales from the stacks, since "the bale, which weighs one-half ton, cannot be controlled after it is separated from the stack; it may go this way or that way; it has no control." He has always stacked bales on top of each other. He has never seen them otherwise. He insisted that the same method of stacking is used in all the piers, since the surface, weight, and size of the bale makes it unnecessary to fasten or alternate them. He asserted that after the stacks are built ". . . the bale can never break loose . . . the stack is not movable at all."

The testimony of Master Francis Crocco, appellant's expert, ratified Candelario Parot's testimony in essence. As master of vessels and superintendent of terminals of the Puerto Rico Line, he testified that he is familiar with the different methods of stacking shipping freight, including bales of jute sacks. He identified defendant's photographic exhibits as "a good example of the method of stacking [bales] on the piers . . . one on top of the other." He has never seen them crossed or alternate. The expert further added that in all his experience he has not seen a bale become dislodged from the center of a stack. On cross-examination by plaintiff's attorney, he stressed that stacks made by placing the bales on top of each other do not have to be supported by stakes, although he pointed out that if actually there were stakes "it meant something." In his opinion, only the "soft" sacks are apt to slide or roll from stacks which are fastened or alternate. He took as an example the rice sacks the porosity of which permits the powder of the grain to come out through the sack making it slippery, in which case it is always a good idea "whenever possible, to fasten the sacks."

Lastly, witnesses Ramiro Ortiz, Rodolfo de Jesús, and Juan L. Casellas testified. The first testified that as customs inspector in the piers he had seen many stacks of bales. All of them were stacked as shown in the photographs to which we have made reference. He never saw fastened or alternate stacks. Foreman De Jesús was the one who made the stack in question. He denied that it needed to be supported by stakes or beams because the size and weight of the bales laid on top of each other is sufficient to make the load of bales secure. He has not seen either fastened or tied stacks. Casellas has been employee and manager of appellant's shipping department. He always saw the bales stacked on top of each other in the manner above described.

There is no controversy on the manner in which the bales were stacked. The trial court concluded that the defendant was negligent in failing to alternate the bales when building the stacks. It based its conclusion on the opinions of plaintiff's witnesses. Defendant, as we have seen, presented expert evidence to show that the stack was made in the usual and general manner, and that experience has shown that it is the safe way of doing it. A question of credibility is not therefore involved here. It is simply a question of weighing the evidence presented. After considering the facts and the expert evidence presented, we are convinced that, except for another's intervention or extraneous causes, it was physically improbable that the bales could break loose by themselves from a stack built as was customary with defendant. We pointed out earlier the manner of building stacks, namely, in columns four bales high forming a rectangular stack. Each bale weighs over one-half ton, its surface is flat all throughout, and its base approximately 24 inches long rests parallel on the surface of the lower bale. Its solidity is unquestionable. The merchandise contained in the bale is not susceptible of altering the shape, surface, or position of the bale when it is subjected to the weight

and pressure of surrounding bales. Certainly the canvas or coarse wrap covering the surface of the bale cannot be considered, even remotely, slippery. On the contrary, it necessarily has to produce friction between the sides of the bales thereby making the stack safer. How is it possible, then, for a bale such as that described to break loose by itself from a column of four bales the combined weight of which exceeds two tons? Yet, appellee points out that this is a hazardous and unsafe way of stacking. He asserted that the evidence showed that the size of a bale is proportionally the same as that of a sack of sugar, or slightly less than twice the width, and that appellant's own witness, Candelario Parot, testified that the stacks of sugar and bean sacks are lifted "tied up." The reason for tying these stacks is obvious. As pointed out by expert Crocco and expressly admitted by witness Castro Molina,[3] their soft content and irregular surface makes it necessary to cross or alternate the different levels, since the sacks may slip or change position as a result of the weight of the stack.

In fact, the only evidence presented by appellant in support of his theory was the testimony of Castro Molina and Serafín Esteban. The alternate or tied bales seen by the former were those which he delivered to Central Constancia. He has 32 years' experience transporting freight on the piers and, although he asserted that "those stacks almost always break open," he did not mention any place or occasion when he saw bales slide as that in the case at bar, or that they were stacked in the manner allegedly employed in Central Constancia. The latter merely pointed out that

---

[3] "Q. Are you familiar with the method of stacking sugar in sacks?
A. Well, yes.
Q. That the stacks are fastened?
A. Yes, sir.
Q. Is it correct or not that the stacks are fastened because the stacks are very soft and irregular?
A. Yes, sir."

the vibration of the pier where he worked produced by the traffic of trucks caused the tied stacks 10 or 15 high to move up. Smaller stacks were made in the same manner as appellant did. It is well to point out, however, that there was no evidence to the effect that appellant's pier where the bales were stacked was affected by the peculiar condition pointed out by appellant. Indeed, we cannot ignore the reality which 16 years of stacking bales one on top of another represents without ever occurring a mishap until the date of the accident. It should be noted further that not one of the witnesses and experts who testified asserted having previously seen a stack of bales one on top of another collapse by itself. We have recited the experience of experts Parot, De Jesús, and Master Crocco on stacking bales and other maritime freight. Parot has worked supervising the unloading and stacking of these bales since the commencement of their importation at the rate of 27,500 bales a year. De Jesús has worked exclusively with bales since 1948. Witness Crocco, in the course of his experience as master of ships and supervisor of terminals, has had occasion to observe and stack bales of sacks on numerous occasions. His competency on these points is unquestionable. All of them adduce the reasons which we have already described to show that the fall could not have physically occurred except for some outside force which moved the bales after they were stacked the way appellant used to. We share their opinion, for we understand that the preponderance of the creditable expert evidence which the court had under consideration established that the stacking method employed by appellant was the most common and safest for this class of bales.

It appears then that the proximate cause of the accident must have manifested itself as a result of someone's intervention with the stack from which the bales fell between the time appellant's employees made the stack and the time of the accident. And to this effect it is well to point out the

manner in which Castro Molina's employees carried the bales from the Constancia stack to their respective trucks. Having no specialized mechanical equipment to handle this freight, they climbed atop the stack to separate the bales with a hook and push them until they fell to the truck platform. Castro del Valle testified that he employed "a small crowbar which was rather short, but which could exert more force than a person" which they introduced in a "crack" between the bales, exerted force against the crowbar, removing the bale and letting it fall to the platform.[4] According to Castro

---

[4] "Q. Then the five of them set to work on one of those bales and placed it on the truck?

A. Using some trick.

Q. What trick did you use?

A. We pushed it a little at a time and then we placed the top part; all of us worked on it and tried to place more than half on the truck.

Q. You did that with those which were on the floor, and what about those which were on top?

A. We used a small crowbar.

Q. How small is that crowbar?

A. Rather short, but it has more strength than a person.

Q. Do you mean to say that you moved a bale of ten quintales with a small crowbar?

A. Yes, sir.

Q. How did you do it?

A. It was placed in the crack between the two borders; you push it slightly in order to be able to insert the fingers.

Q. And in the meantime where is the one who is using the small crowbar?

A. He has moved away from one of the bales.

Q. Forget that none has been removed, there is a stack five bales high.

A. Pardon me, sir. I said that there was a stack five or six bales high. The top one is going to be crowbarred, you stand on the bale on the side and crowbar outward.

Q. Then one stands on a bale of the stack and from there you start to crowbar?

A. Correct. It is not necessary to crowbar much; it is only sufficient to insert the crowbar and insert your hand.

Q. But do you mean to tell me and the court, then, that after making room to bring it down, the four of you brought it down by hand and wrist?

A. No, because every time we started to load we drew the platform of the truck near the stack. We disengaged, we pushed, and it fell to the platform."

Molina, "we used hooks for pulling [the bales] and three men pushing from behind, we moved and rolled them over until we placed them in position, landing like that the 15 bales on the truck." If we bear in mind that both stacks were only 18 inches apart, the real possibility arises that the laborers of Castro Molina, or Juan Gay, who also had no "fingerlifts," must have exerted pressure or leaned against the nearby stack in order to release the bales, with the result that they jolted the column of bales of the nearby stack. Subsequently the jolts caused by the work performed by the appellee and his coworkers upon placing on the truck the layer of bales which they carried on the second trip could have caused them to fall causing injuries to appellee.

Lastly, it is contended that the testimonies given by witnesses Ramón Dones and Castro Molina showed that the stack which caused the damage was tilted and supported by stakes on the back part. However, on direct examination and subsequently on cross-examination Castro Molina had already denied having seen anything abnormal in the nearby stack, also asserting that he only noticed that it was "four bales high and that it was not tied."[5] And it is reasonable to think that it was so, for how then can it be explained

---

[5] "Q. And after the bales fell, you looked at the stack from which they had fallen?
A. Yes, sir.
Q. Did you notice anything in connection with that stack?
A. I noticed a defect in the stack.
Q. How were those bales stacked, Don Manuel?
A. Those bales were stacked on top of each other, four bales high.

.    .    .    .    .    .    .    .

Q. Did you notice anything in the nearby stack when you started to unload it that day?
A. I did not notice anything on the nearby stack because I was not going to pick it up, since the only thing I did was to load what I was loading.
Q. So, you did not see anything abnormal nor different on any stack?
A. I only saw that it was four bales high and that it was not fastened."

that it should permit its employees to work there exposing themselves to the grave risk which the fall of those bales presupposes? Furthermore, if it thought that the stack was defective and hazardous, why did it not warn appellant of this condition? The reason is evident. The witness did not notice anything abnormal in that stack as originally made early in the morning of the accident. The inclination in the stack, if any, must have been caused by the intervention of the laborers of Castro Molina and Juan Gay in the unloading of the bales from the Constancia stack as a result of which the bales of the nearby stack fell.

From the foregoing we cannot therefore conclude that San Juan Trading Co. was negligent in stacking the bales the way it did. Other forces necessarily intervened for which it can not be held responsible.

In view of the conclusion reached, we need not consider the petition interposed by plaintiff.

The judgment will be reversed and another rendered instead dismissing the complaint.

